UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
PHYLLIS SMITH,                                  :
                                                :
                        Plaintiff,              :
                                                :
           -against-                            :               **OPINION AND ORDER**
                                                :                11-CV-5627 (DLI)
MICHAEL J. ASTRUE, Commissioner of              :
Social Security,                                :
                                                :
                        Defendant.              :
--------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Phyllis Smith ("Plaintiff") filed an application for disability insurance benefits

("DIB") under the Social Security Act (the "Act") on February 26, 2008.  (R. 89-90.)[1]  By a

decision dated October 29, 2009, Administrative Law Judge Dominic Cofresi (the "ALJ")

concluded that Plaintiff was not disabled within the meaning of the Act.  (R. 9-24.)   On

September 20, 2011, the ALJ's decision became the Commissioner's final decision when the

Appeals Council denied Plaintiff's request for review.  (R. 1-4.)

Plaintiff filed the instant appeal seeking judicial review of the denial of benefits pursuant

to 42 U.S.C. § 405(g).  The Commissioner moves for judgment on the pleadings, pursuant to

Fed. R. Civ. P. 12(c), seeking affirmation of the denial of benefits.  (*See* Docket Entry No. 10.)

Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's

decision and remand for further proceedings, or, in the alternative, a calculation of benefits.  (*See*

Docket Entry No. 12.)

---

[1]  "R." citations correspond to numbered pages in the certified administrative record.  (Docket
Entry No. 15.)

For the reasons set forth below, the Commissioner's motion is denied, Plaintiff's cross-motion is granted to the extent that this matter is remanded for further administrative proceedings consistent with this opinion.

## **BACKGROUND**

**A.     Non-Medical and Testimonial Evidence**

Plaintiff was born in 1960, graduated from high school in 1979, and obtained a vocational certificate from business school in 1982.  (R. 36, 116.)  Plaintiff began working as a corrections officer for the New York City Department of Corrections in July 1986 and held that position for approximately 20 years, retiring on May 5, 2006.  (R. 38, 111.)  Plaintiff briefly resumed working as a detention officer from November 29, 2007 to February 23 2008, but left the position due to her physical condition.  (R. 38-39, 111.)

At the September 29, 2009 hearing, Plaintiff testified that she is unable to work as a result of problems with her knees, back, and ankles.  (R. 39.)  Specifically, Plaintiff stated that she suffers from pain in her legs, which she rates as an 8 on a 10-point scale, and buckling in her knees.  (R. 43-45.)  Plaintiff also indicated that her pain is aggravated by walking long distances and using stairs.  (R. 44.)  Plaintiff, who has used a cane since 2003, estimated that she can walk for up to 15 to 20 minutes, but would need to rest afterwards for an additional 15 to 20 minutes.  (*Id.*)  In addition to leg pain, Plaintiff indicated she suffers from back pain, which she rates as a 9 on a 10-point scale.  (R. 46.)

Plaintiff testified that, on an average day, she sits up in bed in the morning because it hurts for her to lie flat for too long.  (R. 41.)  Plaintiff stated that she is "mainly just housebound," and that her daughter prepares her meals and performs other household chores.

2

(R. 41, 46.)  Plaintiff also stated that she does not drive "too often," but at times drives to the supermarket and certain medical appointments.  (R. 41-42.)

Plaintiff currently does not take any prescription medication for her condition.  (R. 39-40.)  Plaintiff noted that she previously took Celebrex, but stopped due to gastrointenstinal side effects.  (R. 39.)  Plaintiff noted that she still takes Ibuprofen, Advil, Tylenol, and natural herb medication, which provide some relief for her pain.  (R. 43.)

## B.    Medical Evidence

### 1.    Medical Evidence Prior to the Onset Date

On December 15, 2003, Plaintiff began seeing Dr. Ludwig Licciardi, an orthopedic surgeon.  (R. 257-58.)  According to Dr. Licciardi's notes, in April 2003, Plaintiff sustained injuries when a bus collided with her automobile.  (R. 257.)  Following the accident, Plaintiff visited several doctors and underwent physical therapy; however, the pain in Plaintiff's neck, right elbow, back, and legs did not improve.  (*Id.*)  Dr. Licciardi noted that Plaintiff required a cane to ambulate.  (*Id.*)  Dr. Licciardi reviewed MRIs of Plaintiff's knees, which revealed a partial anterior cruciate ligament ("ACL") tear in the right knee, as well as a possible tear of the posterior cruciate ligament ("PCL"), extensive chrondromalacia, joint effusion, and infrapatellar tendonitis in the left knee.  (R. 258.)  Dr. Licciardi advised Plaintiff to undergo arthroscopy.  (*Id.*)

On February 11, 2004, Dr. Licciardi performed surgery on Plaintiff's right knee, which included PCL and ACL repair, abrasion arthroplasty of the medial compartment, notchplasty, arthroscopic synovectomy, and medial and lateral meniscal repairs.  (R. 213-15.)  In a follow-up visit on February 19, 2004, Dr. Licciardi advised Plaintiff to continue to use Bextra and Vicodin, as needed, and strongly recommended that Plaintiff begin physical therapy.  (R. 259.)

On April 8, 2004, Plaintiff returned to Dr. Licciardi, reporting discomfort in the right knee and severe pain in the left knee and right elbow. (R. 259-60.) Dr. Licciardi reviewed an MRI of Plaintiff's right elbow, which showed evidence of joint effusion. (R. 260.) On May 5, 2004, Dr. Licciardi performed right elbow surgery, which included arthroscopy, synovectomy, joint exploration and removal of loose body, and abrasion arthroplasty of the radial head. (R. 216-17.) On a May 13, 2004 follow-up visit, Dr. Licciardi advised Plaintiff to continue to use Bextra and Percocet. (R. 261.) Additionally, Dr. Licciardi advised Plaintiff to continue using a cane in light of Plaintiff's continued complaints of leg pain and swelling. (*Id.*)

On June 24, 2004, Plaintiff advised Dr. Licciardi that the condition of her right elbow had improved, but she was now concerned about swelling, pain, and locking of her left knee. (R. 282-83.) On July 21, 2004, Dr. Licciardi performed surgery to repair the left knee, which included arthroscopic synovectomy, medial meniscal and lateral meniscal repairs, and arthroscopic repair of the ACL. (R. 218-20.) Upon discharge, Dr. Licciardi prescribed Percocet. (R. 245-48.) In a July 29, 2004 follow-up visit, Plaintiff reported experiencing pain, stiffness, and restricted range of motion in the left knee. (R. 262.) Dr. Licciardi requested authorization for physical therapy three times a week for Plaintiff's left knee, and opined that Plaintiff was "still totally disabled." (R. 263.) On August 13, 2004, Dr. Licciardi noted that Plaintiff reported "great progress," but still experienced mild swelling and soreness in the left knee, especially when on her feet for most of the day. (*Id.*) Plaintiff indicated that she would return to full-time work as a corrections officer on August 17, 2004. (*Id.*)

Approximately one year later, on September 1, 2005, Plaintiff visited Dr. Licciardi again and complained of stiffness, pain, and restricted range of motion in the left knee, and the inability to ambulate. (R. 264.) Dr. Licciardi noted evidence of joint effusion and advised

aspiration of the left knee.  (*Id.*)  Dr. Licciardi also recommended that Plaintiff resume physical therapy and return in six weeks.  (*Id.*)

### 2.  Medical Evidence After the Onset Date

#### i.  *Dr. Licciardi*

Following the May 5, 2006 onset date, Plaintiff made repeated visits to Dr. Licciardi.  On January 5, 2007, Plaintiff returned to Dr. Licciardi and reported continuing bilateral knee problems.  (R. 265.)  Dr. Licciardi noted that Plaintiff still walked with the aid of a cane.  (*Id.*) Dr. Licciardi opined that X-rays revealed degenerative arthritic changes in both knees, as well as calcification of the left knee lateral collateral ligament.  (*Id.*)  Dr. Licciardi aspirated Plaintiff's left knee and injected it with Marcaine and Depo-Medrol.  (*Id.*)  Dr. Licciardi also prescribed Vicodin and Celebrex and sought authorization for MRIs for both knees.  (R. 265-66.)

On February 5, 2007, Plaintiff returned to Dr. Licciardi and reported "some mild pain" in her knees, but did not complain of instability.  (R. 266.)  Dr. Licciardi noted that Plaintiff's insurance company had denied coverage for the MRI of Plaintiff's right knee.  (*Id.*)  Dr. Licciardi prescribed Mobic and encouraged Plaintiff to do home exercises.  (*Id.*)  On December 31, 2007, approximately ten months later, Plaintiff returned to Dr. Licciardi complaining of bilateral knee pain, with more severe pain in her right knee.  (R. 264-65.)  An examination of Plaintiff's right knee revealed locking, swelling, limited range of motion, positive McMurray's sign, crepitus, and medial joint line tenderness.  (R. 264.)  Additionally, Plaintiff's left knee exhibited swelling and tenderness along the medial joint line and intermittent locking.  (*Id.*)  Dr. Licciardi noted that Plaintiff's ambulation remained limited and she continued to use a cane, but that she no longer took medication.  (R. 264.)  Dr. Licciardi aspirated Plaintiff's right knee and

injected Depo-Medrol and Marcaine, prescribed Vicodin and Celebrex, and requested authorization for bilateral knee MRIs.  (R. 265.)

On January 10, 2008 and January 14, 2008, Dr. Licciardi detailed his findings for the bilateral knee MRIs.  (R. 276-77.)  As to the left knee, Dr. Licciardi noted maceration of the body of the medial meniscus with an oblique tear in the posterior horn, advanced degenerative changes in the medial compartment, marrow hyperemia, edema medial femoral condyle, medial tibial plateau, and moderate joint effusion.  (R. 276.)  As to the right knee, Dr. Licciardi noted a tear in the posterior horn to the medial meniscus, moderate joint effusion, and moderate to advanced degenerative changes in the medial joint space.  (R. 277.)

On February 4, 2008, Plaintiff returned to Dr. Licciardi complaining of pain, swelling, and restricted motion in both knees.  (R. 266-67.)  Dr. Licciardi prescribed Naproxen and recommended arthroscopy on both knees; Plaintiff stated she would consider surgery, but indicated she was "worried about missing work."  (R. 267.)  Dr. Licciardi opined that Plaintiff was still disabled due to the April 2003 car accident and advised her to apply for Social Security disability.  (*Id.*)

On March 31, 2008, Dr. Licciardi once again opined that Plaintiff was disabled.  (*Id.*)  Additionally, after Plaintiff complained of upset stomach from taking Naproxen, Dr. Licciardi re-prescribed Mobic and noted that Plaintiff still remained disabled.  (*Id.*)  On May 6, 2008, Plaintiff complained of severe pain in both knees and reported that she could not walk, had difficulty climbing stairs, and experienced pain and stiffness with prolonged sitting.  (R. 268.)  Dr. Licciardi again recommended arthroscopy on both knees and advised Plaintiff apply for disability.  (*Id.*)

On June 4, 2008, Plaintiff underwent surgery on her right knee, which involved arthroscopy, partial medial meniscectomy, and chondroplasty of the medial femoral condyle, trochlea, and patella. (R. 251-52.) Plaintiff followed up with Dr. Licciardi approximately one week later on June 12, 2008 and reported that she was not taking anti-inflammatories and had stopped narcotic medication due to constipation. (R. 269-70.) Plaintiff also reported "minimal pain" and indicated that the severity of the pain had improved after surgery. (R. 269.) Plaintiff also indicated that she still wished to undergo arthroscopy for the left knee due to continued pain. (R. 270.) Dr. Licciardi prescribed Celebrex and indicated that Plaintiff had no history of gastric side effects with that medication. (R. 269-70.) Dr. Licciardi requested authorization for physical therapy and opined that Plaintiff remained totally disabled. (*Id*.)

On July 10, 2008, Plaintiff reported to Dr. Licciardi that her right knee pain was "much better" since surgery, but still reported having left knee pain and instability. (R. 270-71.) Plaintiff reported that she went to physical therapy once, but now was performing stretching and strengthening exercises at home. (R. 270.) Dr. Licciardi prescribed Celebrex, and plaintiff declined a physical therapy referral. (*Id.*) Although Plaintiff wished to schedule left knee surgery, Dr. Licciardi recommended continued rehabilitation of the right knee given that Plaintiff's gait was still slightly antalgic. (*Id.*)

On April 16, 2009, Plaintiff returned to Dr. Licciardi stating that her right knee was feeling "much better" since surgery, but that she still has intermittent pain; Plaintiff also reported that she felt pain and instability in her left knee and took Advil on an as needed basis. (R. 271-72.) Dr. Licciardi discussed various treatment options with Plaintiff, but Plaintiff advised that she "wish[ed] to hold off due to financial reasons." (R. 271.)

On May 8, 2009, Dr. Licciardi noted that Plaintiff "made heroic attempts" at returning to work, but was unable to perform her duties due to severe pain in her knees. (R. 272-73.) Plaintiff complained of right arm weakness, limited range of movement in the right elbow, limitations with ambulation, and bilateral ankle pain. (R. 272.) Dr. Licciardi opined that there was a high likelihood Plaintiff would need further surgical intervention, including joint replacements in both knees as well as future arthroscopies for the right elbow. (R. 273.)

On June 3, 2009, Plaintiff reported that her right knee was feeling better, but that she still had pain in her left knee, which Plaintiff indicated was buckling more than in the past and affecting her daily lifestyle. (R. 273.) Dr. Licciardi advised Plaintiff to ice the knee and take Aleve on an as needed basis. (*Id.*) Dr. Licciardi also recommended surgery and diagnosed left knee medial meniscal tear and right knee status post arthroscopy. (*Id.*) No significant changes were reported in follow ups visits through August 2009. (R. 273-75.)

In a note dated September 16, 2009, Dr. Licciardi stated that Plaintiff was under his care for an orthopedic condition and was "permanently disabled" from any type of work. (R. 300.)

      *ii.*        *Dr. Chang*

On May 19, 2008, Dr. Benjamin Chang consultatively examined Plaintiff at the request of the Social Security Administration. Dr. Chang diagnosed chronic mechanical lower back pain, bilateral knee pain (status post arthroscopic surgeries and osteoarthritis), and obesity. (R. 186.) Dr. Chang opined that Plaintiff could lift and carry 20 pounds occasionally, lift and carry 10 pounds frequently, and stand and walk four hours out of an eight-hour workday, with breaks every 30 minutes. (*Id.*) Additionally, Dr. Chang opined that Plaintiff could sit without restriction, and could kneel, squat, and climb stairs occasionally. (R. 186-87.) He also opined

that Plaintiff required a cane for short and long distance ambulation and on uneven terrain, but did not need an assistive device for ambulation. (R. 187.)

    *iii.*    *Dr. Nour*

   On January 28, 2010, Dr. Mohamed Nour, an orthopedist, consultatively examined Plaintiff at the request of Plaintiff's attorneys and completed a report that was submitted to the Appeals Council. (R. 147-61.) In addition to physically examining Plaintiff, Dr. Nour reviewed bilateral knee MRIs from 2003 to 2008, and surgical reports of Plaintiff's 2004 and 2008 right knee surgeries, 2004 right elbow surgery, and 2004 left knee surgery. (R. 151-52.) Dr. Nour observed that Plaintiff had trouble dressing and getting on and off of the examination table, could not take any steps on heels or toes, and could not squat down. (R. 151.) Dr. Nour diagnosed chronic cervical sprain/strain post trauma, chronic lumbar sprain/strain post trauma, internal bilateral derangement of the elbows and knees, and internal derangement of the left ankle. (R. 152.)

   Dr. Nour completed a Multiple Impairment Question and identified clinical evidence of limited motion in the cervical spine, lumbar spine, elbows, knees, and left ankle that supported the diagnosis. (R. 153.) He also noted that the MRI tests supported the diagnosis. (R. 154.) Dr. Nour opined that Plaintiff was able to sit four hours total and stand/walk less than one hour total in an eight-hour work day. (R. 155.) He further opined that Plaintiff would need to get up and move every 15 minutes when sitting, and that Plaintiff would not be able to sit again for 15 minutes. (R. 155-56.) He reported that Plaintiff could lift and carry no more than five pounds. (R. 156.) He also indicated that Plaintiff would have significant limitations in repetitive reaching, handling, fingering, or lifting, and further, that she was essentially precluded from grasping, turning, and twisting objects. (*Id.*)

9

Dr. Nour estimated that Plaintiff would likely be absent from work more than three times per month as a result of her condition. (R. 159.) Dr. Nour also opined that, "[a]s regards disability, the patient is totally and permanently disabled." (R. 152.)

**DISCUSSION**

## I.      Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. §§ 405(g), 1383(c)(3). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations."

*Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

## II.     Disability Claims

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience. Impairments are "severe" when they

significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1. *See* 20 C.F.R. § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, app. 1.

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity ("RFC") in steps four and five. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

## III.     ALJ's Decision

The ALJ followed the five-step process and determined that Plaintiff had the RFC for at least sedentary work, and, therefore, was not disabled. (R. 14-23.) At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since May 5, 2006, the date she allegedly became disabled. (R. 14.) The ALJ characterized Plaintiff's brief return to work from November 2007 to February 2008 as an "unsuccessful work attempt." (*Id.*) At step two, the ALJ found that Plaintiff's internal derangements and degenerative changes in bilateral knees, back condition, and obesity qualified as severe impairments. (R. 15.) At step three, the ALJ determined that Plaintiff's impairments, individual or combined, did not meet one of the impairments in Appendix 1. (*Id.*)

At step four, the ALJ concluded that Plaintiff could not perform past relevant work as a corrections officer or detention officer, but had the RFC to perform at least sedentary work and a wide range of light work.  (R. 15-22.)  In reaching this conclusion, the ALJ gave the opinion of Dr. Chang, a consultative examiner, "considerable weight," but gave the opinion of Dr. Licciardi, Plaintiff's treating physician, "little weight."  (R. 19.)  Additionally, the ALJ found that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her condition were "not credible" to the extent they were inconsistent with the ALJ's RFC assessment.  (R. 21.)

At step five, the ALJ determined jobs exist in significant numbers in the national economy that Plaintiff could perform.  (R. 22.)  To make this determination, the ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2. (R. 22-23.)  Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act.  (R. 23.)

## IV.  Application

### a.  Failure to Develop the Record and Accord Proper Weight to Medical Evidence

Plaintiff asserts that the ALJ erred by not giving controlling weight to her treating physician, Dr. Licciardi.  (Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") at 10-14, Docket Entry No. 13.)  Specifically, Plaintiff contends that the ALJ failed to give good reasons for rejecting the opinion of Dr. Licciardi and suggests that the ALJ should have developed the record further once he determined that Dr. Licciardi's opinions were incomplete. (*Id.*)

With respect to "the nature and severity of [a claimant's] impairment(s)," 20 C.F.R. § 404.1527(d)(2), "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."  *Green-Younger v.*

*Barnhart*, 335 F.3d 99, 106 (2d. Cir. 2003). A claimant's treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988). A treating physician's medical opinion regarding the nature and severity of a claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). The Second Circuit has noted that "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Lazore v. Astrue*, 443 F. App'x 650, 652 (2d Cir. 2011) (quoting *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

The ALJ must consider the following factors to determine how much weight to give the treating physician's opinion: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant but unspecified factors. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The ALJ is required to provide "good reasons" for the weight accorded to a treating physician's medical opinion; failure to do so is a ground for remand. *Schaal*, 134 F.3d at 503-05; *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") However, the ultimate determination that a claimant is "disabled" or "unable to work" is reserved to the Commissioner. 20 C.F.R. § 404.1527(d). "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to

whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell*, 177 F.3d at 133.

The ALJ's adherence to the treating physician rule operates in tandem with the affirmative duty to develop a full and fair record. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 404.1512(d)-(f) (setting forth the affirmative obligations of ALJs). As part of the ALJ's fundamental duty to develop the record, he is responsible for seeking additional information when the treating physician has not provided an adequate basis to determine a claimant's disability. *See* 20 C.F.R. § 404.1512(d)-(e) (describing responsibility to develop the record). In describing this duty, the Second Circuit has explained that a treating physician's failure to provide a full explanation or clinical findings supporting his or her determination that a plaintiff is disabled, "does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

The ALJ gave "little weight" to Dr. Licciardi's opinion, stating that "[a]t no time did Dr. Licciardi give a detailed explanation of how the claimant's impairments limited her functional capacity." (R. 19.) At the outset, if the ALJ determined that he needed more findings or a detailed functional assessment from Dr. Licciardi, the ALJ should have further developed the record. *Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); *Rosa*, 168 F.3d at 79 (concluding that that ALJs "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record").

The Commissioner contends that the ALJ properly developed the record because the state agency contacted and requested information from Hamilton Medical, Dr. Licciardi's place of

employment, in March 2008.[2]  (Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Mem.") at 19, Docket Entry No. 11; Reply Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Reply Mem.") at 4, Docket Entry No. 14.)  The Commissioner's argument is unavailing.  After the state agency made its initial requests in March 2008, the ALJ did, in fact, receive copies Dr. Licciardi's medical notes, including his more recent notes from May 2008 to September 2009.  However, nothing in the record shows that the ALJ—after receiving Dr. Licciardi's more recent notes—made any attempt to address the perceived gaps in Dr. Licciardi's findings before discrediting them.

The ALJ also erred in discounting Dr. Licciardi's opinion on the basis that the "treating source record reflects a residual functional capacity for at least sedentary work." (R. 19-20.) While Dr. Licciardi's records provide general information as to Plaintiff's symptoms and post-surgery recovery, the records are silent or otherwise vague concerning Plaintiff's ability to sit, stand, walk, and carry (R. 265-300), and, thus, do not operate as affirmative proof of Plaintiff's ability to perform sedentary work.[3]  *Cf. Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347-48 (E.D.N.Y. 2010) (finding that physician's statement that plaintiff had "limitations of a mild degree of lifting, bending, walking, and pushing and pulling on arm controls," did not

---

[2] The hearing before the ALJ took place on September 29, 2009, approximately a year and a half after the state agency made initial contact with Hamilton Medical.  (R. 32.)

[3] "Sedentary work" consists of the following:

> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time . . . .  Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of an 8-hour workday.

SSR 96-9p, 1996 WL 374185 (July 2, 1996).

provide adequate basis for ALJ to determine that plaintiff was capable of sedentary work); *Pimenta v. Barnhart*, 2006 WL 2356145, at *5 (S.D.N.Y. Aug. 14, 2006) ("[T]he absence of a statement that the plaintiff is precluded from all work is not the same as an affirmative declaration that he is able to return to employment.").

In sum, remand is warranted because the ALJ did not properly develope the record or apply the treating physician rule.[4]  Accordingly, on remand, the ALJ must develop the record further by seeking information or findings from Dr. Licciardi concerning Plaintiff's residual functional capacity and ability to perform sedentary work.  Additionally, should the ALJ decline to give controlling weight to Dr. Licciardi, the ALJ should set forth good reasons for doing so.

### b. Assessment of Plaintiff's Credibility

Plaintiff further contends that the ALJ failed to properly apply the seven factors set forth in 20 C.F.R. § 404.1529 when making his credibility determination and made improper inferences about the severity of Plaintiff's condition based on Plaintiff's failure to seek or pursue regular medical treatment.   (Pl.'s Mem. at 14-19.)  The Commissioner responds that the ALJ's finding is based on substantial evidence and is appropriately supported by a detailed discussion of Plaintiff's symptoms, treatment, and other factors.  (Def.'s Reply Mem. at 6-8.)

The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability.  *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2010).  However, the ALJ is afforded the discretion to assess the credibility of a claimant and is not "required to credit [plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v.*

---

[4] Indeed, the relevant factors to be considered suggest that Dr. Licciardi is entitled to greater weight.  Among other things, Dr. Licciardi, an orthopedic surgeon, performed surgery on Plaintiff, regularly treated Plaintiff over a period of at least five and a half years, and opined on Plaintiff's condition based on extensive clinical examinations and findings from MRI and EMG tests, among others.

*Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008)).  In determining Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations.  *See Peck v. Astrue*, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010).  First, the ALJ must consider whether there is a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged.  20 C.F.R. § 404.1529(b); S.S.R. 96-7p, 1996 WL 374186 (July 2, 1996).  Second, if the ALJ finds that the individual suffers from a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work.  20 C.F.R. § 404.1529(c)(1); S.S.R. 96-7p.

Where the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors:  1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief . . . ." *Correale-Englehart,* 687 F. Supp. 2d at 435.  Where the ALJ neglects to discuss at length his credibility determination and the reviewing court cannot decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence,

remand is appropriate.  *Id.* at 435-36; *see also Grosse v. Comm'r of Soc. Sec.*, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding that the ALJ committed legal error by failing to apply factors two through seven); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding because the ALJ failed to address all seven factors).

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible "to the extent they are inconsistent with the . . . residual functional capacity assessment."  (R. 21.)  The ALJ specifically noted that he found Plaintiff's testimony not credible because Plaintiff showed long gaps of medical treatment and stopped participating in a physical therapy program, despite noted benefits.  (*Id.*)  The ALJ also found that a portion of Plaintiff's testimony, in which Plaintiff claimed she discontinued the use of prescription medication due to side effects, was not consistent with the medical record.  (*Id.*)  Finally, the ALJ suggested that Plaintiff's credibility was undermined by her daily activities.  (R. 21-22.)

First, the ALJ erred because he discredited Plaintiff's testimony for a failure to pursue regular treatment and physical therapy without accounting for the justifications set forth in the case record.  Indeed, "[a]n ALJ is required to develop the record regarding a claimant's failure to seek treatment in order to take into account any explanations for such failure."  *Genovese v. Astrue*, 2012 WL 4960355, at *12 (E.D.N.Y. Oct. 17, 2012); *see also Pimenta v. Barnhart*, 2006 WL 2356145, at *6 (S.D.N.Y. Aug. 14, 2006) ("To the extent that the ALJ relied on [the claimant's] refusal to have surgery without determining whether his refusal was justifiable, the decision was in error.")  Specifically, SSR 96–7p mandates as follows:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical

treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.

SSR 96–7p, 1996 WL 374186, at *7 (July 2, 1996).

Here, the ALJ failed to consider key evidence in the medical record concerning Plaintiff's lapses in medical treatment and physical therapy. Most notably, after the onset date, Dr. Licciardi's notes indicate that Plaintiff declined to return for follow up visits due to financial hardship. (R. 271.) On another occasion, Dr. Licciardi noted that Plaintiff's insurer denied coverage for recommended medical testing. (R. 266.) Dr. Licciardi also documented that, despite recommending physical therapy to Plaintiff, Plaintiff "wish[ed] to hold off due to financial reasons."[5] (R. 271.) The ALJ failed to address or consider these facts as part of his credibility determination.

Second, the Court finds no clear inconsistency between medical records and Plaintiff's testimony that she discontinued the use of prescription medication due to side effects. The ALJ suggests that Plaintiff's testimony conflicts with Dr. Licciardi's notes from 2008, which indicate that Plaintiff's side effects to prescription medication were resolved once Dr. Licciardi placed Plaintiff on Mobic and Celebrex.[6] (R. 21.) Yet Plaintiff's testimony at the hearing suggests that

_____

[5] When questioned by her representative at the hearing, Plaintiff confirmed that she could not afford the payments for physical therapy. (R. 49.) However, at Dr. Licciardi's recommendation, Plaintiff continues to perform home stretching and strengthening exercises as an alternative to physical therapy. (R. 49, 271-73.)

[6] To highlight the purported inconsistency, the ALJ cites to two medical notes: one from March 21, 2008, in which Dr. Licciardi noted that Naprelan upset Plaintiff's stomach and advised returning to Mobic, and a second from June 12, 2008, in which Dr. Licciardi recommended Celebrex because Plaintiff had no history of side effects to that medication. (R. 196, 269-70.)

the side effects from those medications built up over time and became intolerable to Plaintiff after several months of usage. (R. 39-40.) Indeed, in a note from the following year, dated August 5, 2009, Dr. Licciardi no longer advised Plaintiff to take Mobic or Celebrex, but instead recommended that Plaintiff take Aleve because Plaintiff "reported no gastric or cardiac events" to that medication. (R. 275.)

Third, despite the ALJ's suggestion that Plaintiff was not credible because "the record shows that the claimant is capable of functioning on a daily basis" (R. 21), courts within the Second Circuit have held that "an individual who engages in activities of daily living, especially when these activities are not engaged in 'for sustained periods comparable to those required to hold a sedentary job,' may still be found to be disabled." *Kaplan v. Barnhart*, 2004 WL 528440, at *3 (E.D.N.Y. Feb. 24, 2004) (quoting *Balsamo v. Chater*, 142 F. 3d 75, 81 (2d Cir. 1998)). Moreover, "before finding that [a claimant is] not a credible reporter of his own limitations, the ALJ [is] required to consider all of the evidence of record, including [the claimant's] testimony and other statements with respect to his daily activities." *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010).

Here, the ALJ failed to explain how Plaintiff's limited daily activities led him to conclude that Plaintiff's statements concerning the severity of her pain and symptoms are not credible. Furthermore, the ALJ's analysis of Plaintiff's daily activities is based on selective citation to the record. For instance, the ALJ indicated that Plaintiff is capable of sedentary work because she testified that she has "no need to lie down or elevate her legs throughout the day;" however, the ALJ did not address whether Plaintiff's inability to sit continuously for more than 15 to 20 minutes before needing to stand and adjust would affect her ability to work.[7]  (R. 21, 45.)

_____

[7] Indeed, during the hearing before the ALJ, which lasted approximately thirty minutes, Plaintiff requested to stand up due to pain. (R. 34, 45, 50.)

Additionally, the ALJ noted the claimant has the ability to perform "light cooking" and is "able to care for her personal needs," without reconciling it with evidence that Plaintiff's daughter, who lives with Plaintiff, regularly cooks and performs the household chores on Plaintiff's behalf. (R. 120.)

Accordingly, the Court remands this action so that the ALJ can properly evaluate Plaintiff's credibility.

### c. Evidence Before the Appeals Council

Under the Act, a claimant may submit "new and material evidence" to the Appeals Council "where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.970(b) and 416.1470(b); *see also Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) ("Although the new evidence consists of documents generated after the ALJ rendered his decision, this does not necessarily mean that it had no bearing on the Commissioner's evaluation of [the] claims.")

Plaintiff suggests that Dr. Nour's opinion, previously submitted to the Appeals Council, should be considered by the ALJ on remand. (Pl.'s Mem. at 19-21.) Although the Court concludes that Dr. Nour's opinion is new and material evidence,[8] it is unclear whether the opinion reflects a retrospective assessment of the severity of Plaintiff's condition at the time of the ALJ's decision. Accordingly, on remand, the ALJ should inquire whether Dr. Nour's opinion is retrospective, and, if so, consider the evidence and accord it the proper weight. *See Pena v. Astrue*, 2011 WL 321741, at *4 (E.D.N.Y. Jan. 31, 2011) (finding remand warranted "to

---

[8] Dr. Nour's assessment, which was created after the ALJ's decision, provides more detail concerning Plaintiff's functional capacity than Dr. Chang's assessment. (R. 147-61, 184-87.) Additionally, unlike Dr. Chang, Dr. Nour reviewed records from Plaintiff's June 2008 right knee surgery, which were not available at the time that Dr. Chang provided his assessment. (R. 151, 184.)

allow the ALJ to inquire whether the note [submitted to the Appeals Council] reflects a reassessment of the severity of [the claimant's] condition at the time of the ALJ's decision.").


## CONCLUSION

For the foregoing reasons, the Commissioner's motion is denied and Plaintiff's motion for judgment on the pleadings is granted. Accordingly, pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further administrative proceedings consistent with this opinion. Plaintiff's alternative request for remand solely for a calculation of benefits is denied. *See Raja v. Astrue*, 2012 WL 1887131, at *4 (S.D.N.Y. May 23, 2012) ("Generally, when there has been legal error or a failure to develop the record, a reviewing court should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence.") (internal quotations and citations omitted). On remand, the ALJ is to: (i) fully develop the administrative record by obtaining additional information from Dr. Licciardi as to Plaintiff's residual functional capacity and reassess the weight to be accorded to Dr. Licciardi's opinion; (ii) reassess Plaintiff's credibility and explain the weight given to Plaintiff's testimony in light of all of the relevant factors and Plaintiff's work history; and (iii) determine whether Dr. Nour's opinion is retrospective and, if necessary, consider the evidence and accord it the proper weight.

SO ORDERED.

Dated: Brooklyn, New York
　　　March 22, 2013

　　　　　　／s／
　　　　　　DORA L. IRIZARRY
　　　　　　United States District Judge
